# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### MACON DIVISION

| | | |
|---|---|---|
| **JAMES RICHARDSON,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | **5:05-CV-353 (WDO)** |
| | : | |
| **JM SMITH CORPORATION,** | : | |
| | : | |
| **Defendant** | : | |

## ORDER

Plaintiff James Richardson filed this case against his former employer, Defendant JM Smith Corporation, alleging harassment and discriminatory termination based on Plaintiff's religion, Jehovah's Witness. The case is before the Court on Defendant's motion for summary judgment.

### *Factual and Procedural Background*[1]

JM Smith Corporation ("JMS"), located in Spartanburg, South Carolina, is the parent company of Smith Drug Company. Smith Drug Company transports and distributes prescription and over the counter medication as well as other non-medical goods to pharmacies in several southeastern states. Smith Drug Company previously operated a distribution hub in Macon, Georgia, which was closed for financial reasons in June of 2005. Plaintiff James Richardson was hired on February 8, 1999 as a driver for Smith Drug

---

[1]These are the material facts in the record with any dispute by Plaintiff noted and with all facts construed in Plaintiff's favor as the non-movant.

Company. During Richardson's employment, Isaac Rogers was the Human Resource Generalist at JMS. Ann Howell was the narcotics coordinator in Spartanburg. Bobby Hawkins was the supervisor of all warehouse operations including the facilities in Macon, Georgia and Spartanburg, South Carolina. Hawkins traveled to the Macon facility 2-4 times per year. Charles Butler was hired as a driver before Richardson became employed and was later promoted to supervisor of the Macon facility. Butler eventually transferred to Spartanburg and remains employed with Smith Drug. Judy Ragan was hired as a delivery driver on May 3, 1999, approximately three months after Richardson was hired. When Butler left JMS, Hawkins made Ragan and Tracie Walters joint supervisors of the Macon facility. As a joint supervisor, Ragan was the route coordinator and was responsible for making sure all the routes ran smoothly. Walters was the office facilitator and was responsible for time cards. Ragan reported to Bobby Hawkins daily regarding events at the Macon facility. Ragan always discussed employee problems with Hawkins before taking any action and Hawkins instructed Ragan on when or if she should administer discipline.

A tractor trailer from Spartanburg arrived each morning at the Macon facility where the merchandise was then divided and delivered by drivers to pharmacies on their daily routes. Some of the drugs were classified by the government as controlled substances, such as Ambien or Robutussin with Codeine, and some were classified as narcotics, such as oxycontin, fentanyl and duragesic. The truck arrived in Macon around 5:00 a.m. The truck contained cages that were used to secure narcotics and controlled substances. Upon arrival,

the cages were removed from the truck, the merchandise was sorted by store and the merchandise was loaded into individual vans for delivery. A number on the label of each box indicated which route was to receive the box. JMS produced paperwork for each store that listed the merchandise contained in the sealed boxes on the truck. There was no productive work to be done before the truck arrived in Macon. JMS did not want the drivers to clock in until the truck arrived because the company was cost conscious and kept a close eye on overtime and payroll expenses.

The drivers' work schedules were determined by the route they drove and their routes changed periodically. The drivers' duties included accounting for merchandise, delivering merchandise in a timely manner and ensuring the satisfaction of the customers on their route. Ragan drove a route during the time she was a supervisor but eventually got a shorter Macon area route so she could return to the distribution facility before the other drivers to perform her office duties. Richardson generally arrived at 6:00 a.m., counted his orders, loaded the van with merchandise and delivered the merchandise to the customers on his route. Richardson's duties did not change after Ragan became his supervisor.

At all times during Richardson's employment, JMS had in place policies and procedures instructing drivers how to perform their various responsibilities, prohibiting discrimination and harassment and providing effective reporting procedures which allowed the employee to report problems to his or her immediate supervisor, department manager or Human Resources. The handbook contains an Equal Employment Opportunity policy and

other policies that prohibit harassment or discrimination based on criteria including race and religion. The handbook also prohibits insubordination which is defined as " . . . the failure or refusal to obey orders or instructions of supervisors or management, the use of abusive or threatening language towards such individuals, or any conduct that undermines supervisory authority." Employees are prohibited from modifying their work hours without supervisory consent. JMS vehicles may be used for work related purposes only and are subject to inspection without notice to the employee and without the employee's presence. Drivers are required to check all controlled drugs with the customer and errors are to be reported immediately. Drivers are required to report any missing merchandise to their supervisor or someone in the JMS headquarters in Spartanburg. The drivers are responsible for notifying their supervisor every 5,000 miles that their vehicle needs an oil and filter change and the supervisor either takes care of it or has the drivers do it themselves. Ragan took the vans to be serviced when her route allowed her to return to the office by 12:00 or 12:30 p.m. but eventually each individual had to get their own vehicle serviced. Butler sometimes took the vans for service because he had a shorter route but always coordinated this with Ragan. The servicing of vans was coordinated through Ragan because determining who would take the vans for service might affect overtime hours. Drivers are also required to pull the labels off of all boxes so they can be reused because the boxes are expensive. Drivers are paid $.05 per box to pull the labels off and return them to JMS and the company even pays for boxes the drivers pick up that are not JMS boxes. The narcotics cage is open during the day while it

is empty but at the end of the day drivers place narcotics returned by customers in the cage and it is locked thereafter. Ragan originally stayed at the facility until the last driver reported but JMS changed this because Ragan was getting too much overtime, one of the reasons being that Richardson was regularly late returning from his route and Ragan would have to wait on him. All of the drivers have access to the keys to the cage and know the alarm code. The drivers, including Richardson, also know that the last driver is responsible for locking the narcotics cage before they leave. Richardson acknowledged receiving the employee handbook and was familiar with the policies contained in the handbook during his employment.

JMS provides drivers with preprinted delivery sheets to keep track of the merchandise delivered on each route. Merchandise is tracked by listing the number of boxes of repacks, controlled boxes, narcotic boxes and coolers. Drivers are supposed to check all of their merchandise by store against the supplied invoices, mark down their inventory on the spaces on the delivery sheets, input totals, count the merchandise and make sure they have everything they are supposed to have before leaving on their routes. On the delivery sheet, the second shaded column from the left is marked "Q-U-A-N" for quantity. In the quantity column, the driver writes the number of cases of miscellaneous repack, the number of cases of controlled repack, the number of cases of original, the number of cases of narcotics and the total number of cases. There is a specific procedure for writing up narcotics and controlled drugs on delivery tickets which requires placing the four digit control number next

to the amount of narcotics, such as "1 narc, 3204." The number indicating the number of boxes goes in the quantity column on the delivery sheet but the number indicating the type of narcotic or control drug is supposed to be written to the side. Next to the number of cases of narcotics, the drivers are required to write to the right-hand side of the quantity column the tracking number that appears on the label of the narcotic so JMS will know which box was delivered. All drivers receive training on how to count merchandise and complete the delivery sheets. Richardson had several problems with his deliveries because he only noted the quantity of boxes and not the tracking numbers for the boxes, so there was no way to confirm what box numbers he had delivered only that he had delivered a certain number of boxes. On one occasion when Hawkins inspected the delivery receipts, all of the drivers except Richardson were writing them up properly. Hawkins examined Richardson's delivery receipts and saw that he was not writing them up properly, noting that Richardson would not write down the narcotic or control number, only the amount.

If a driver did not count his merchandise and document it properly on the delivery sheet before leaving the warehouse, it was possible to be missing something when the driver arrived at the customer's store. If a driver noticed a missing a drug, the driver was responsible for notifying his or her supervisor or the warehouse in Spartanburg but sometimes the customers would call and notify JMS of the missing drugs. Drivers were instructed to call Ragan if a box was missing but to call Spartanburg whenever controls or narcotics were missing because of strict laws regarding those drugs. JMS provided cell

phones to all drivers for a short period of time to call JMS but the arrangement did not work and within months the cell phones were no longer used. The drivers could also call using their personal cell phones, if they had one, or from the phone at the customer's location. Whether a driver was disciplined for a mishandling of drugs would depend on whether the drugs were narcotics, controlled substances or over the counter items. If there was a problem with a delivery, Ragan would look through the van for documentation or anything that might have been left in the van.

Richardson had 12-14 stops on his route and was supposed to arrive at work at 6:00 a.m. and leave as soon as his truck was loaded, around 6:30 a.m. Richardson should have been returning to the warehouse by 3:30 p.m. or 4:00 p.m. if he stopped for a 30-minute lunch break. Richardson was the last driver to return from his route most of the time because he had the second longest route. For a while it was taking Richardson longer than nine and a half hours to run his route. The company was trying to control payroll expenses at the Macon facility and Ragan thought that Richardson's hours were consistently more than they should have been. Ragan and Walters questioned his whereabouts based on his gas receipts. Ragan asked Richardson why he was always late and he said it was because that is how long his route took. Ragan and Walters followed Richardson on May 28, 2002 to see why it was taking him so long to run his route and videotaped him while they followed him.[2] The video showed that Richardson stopped at his family's funeral home for an hour on one occasion

---

[2]Ragan Dep. at 59.

and then made another stop at a flower shop. The funeral home was ten to fifteen miles off Richardson's route. Richardson's house was on the same property as the funeral home. The video also showed Richardson picking up someone on I-75 and taking him to Advance Auto. Richardson testified that he knew the individual from the gym and picked him up because his vehicle had broken down on the road. Richardson's truck was empty at the time. Ragan thereafter told Hawkins that Richardson was getting excessive overtime because he was wasting time on his route and arriving earlier than necessary to make it to his first stop on time. Ragan asked Butler to run Richardson's route and Butler confirmed it took him nine hours to run the route without stopping for lunch. Ragan determined when she rode with Richardson that the route could be done in nine hours and told Hawkins. When Hawkins went to Macon and rode Richardson's route with him, it took nine hours. Based on the fact that the route took nine hours, Hawkins decided to pay Richardson a flat rate for nine and a half hours to allow for circumstances that might vary the time.[3] Hawkins told Richardson if he was delayed for some reason to note it and he would be paid for time legitimately spent on the route. Hawkins testified that he would have followed anyone if he thought there was a discrepancy in the hours it took to run the route.

On August 9, 2001, Richardson sent a letter to JMS management stating that Ragan denied him a raise because of his religion, searched his van and removed religious paraphernalia, wrongfully accused him of various things and made him drive his van without

---

[3]Hawkins Dep. at 36-37.

proof of insurance.  In the letter, Richardson claimed Tracey Walters questioned him

disrespectfully about his whereabouts but attributes her actions to Ragan because they were

"a team."  Rogers responded to Richardson's letter by going to Macon and investigating.

Rogers discussed allegations that customers had complained that Richardson was handing

out religious flyers, which Richardson denied although Hawkins had received a complaint

from a customer that Richardson was giving out religious flyers on company time.  Ragan

stated that she was not aware of Richardson trying to promote his religion to customers or

coworkers.  As for the insurance matter, it was determined that Richardson was stopped

during a road block and received a ticket for failure to provide proof of insurance - the new

insurance cards had not yet arrived in the mail but the insurance never expired.  Richardson

told Hawkins he did not want to drive the vehicle without proof of insurance but Hawkins

told him that he needed to drive it and if he got a ticket the company would pay for it.

Hawkins stated that if Richardson had received a ticket for no proof of insurance and turned

it in Hawkins would have reimbursed him out of his pocket if the company did not pay him.

Richardson's annual increase scheduled for the summer of 2001 was delayed until December

13, 2001 because Richardson was not following JMS procedures.  Richardson claims that

Ragan told him he did not receive a raise because his "mind was on his religion instead of

his job."  Ragan denies telling Richardson that however.  Ragan believed that Richardson

was insubordinate by not following her instructions and continuously questioning her

authority by going over her head to Hawkins.  Hawkins and Ragan mutually agreed to

temporarily withhold Richardson's raise in the summer of 2001 for six months. Hawkins and Ragan testified that Hawkins made all ultimate decisions on who got raises in salary and the amount.[4] Ragan stated she did search Richardson's van once or twice and removed gas tickets and delivery sheets. It is not clear from the record whether Ragan ever removed any audiotapes or other religious material from Richardson's van or asked him not to carry such material.[5] Rogers concluded from his investigation that Ragan was not treating Richardson differently because of his religion.

Richardson received a written warning on October 9, 2001 because he was not following directions when preparing delivery receipts. Richardson was not counting his merchandise and recording it on the sheet before leaving the warehouse. Richardson's failure to follow this procedure was causing him to arrive at his customers' stores without merchandise. It was also critical to do this properly because DEA standards require a strict accounting for every controlled substance and narcotic. Ragan discussed this issue with Hawkins before writing up Richardson and Hawkins told her to issue the discipline. Richardson claims he was given the warning because of religious discrimination based on his belief that Ragan disliked him, Ragan's alleged removal of personal items from his van and because no other drivers were warned as far as Richardson knew. Specifically,

---

[4]Hawkins Dep. at 17, 20.

[5]Rogers did testify that he talked to Ragan about removing tapes from Richardson's van and Ragan stated that, for safety reasons, drivers should not listen to audiotapes with headphones while driving the vans. Rogers Dep. at 36.

Richardson claims Ragan and Wesley Smith were not warned for failure to properly write up delivery sheets. Ragan in fact reprimanded Wesley Smith for failing to properly fill out his delivery sheets. Richardson was warned and understood that further violations could lead to termination. Just two days later, Richardson received a written warning on October 11, 2001 for failure to lock the narcotics cage.

Richardson apparently had no problems for a while but then received a reprimand on February 18, 2003 for failing to check off controlled substances and narcotics for a customer which caused the drugs to be left at the wrong store. When Richardson failed to deliver the drugs to the store and arrived at the next store, which was owned by the same man, the owner signed for the drugs and said he would return them to the first store. Ragan received a call from the customer telling her that the merchandise had been delivered to the wrong store. The drugs Richardson failed to deliver were controlled substances that were supposed to be checked off with the customer while Richardson was still there. If Richardson had followed procedure and waited with the clerk while the drugs were checked, he would not have delivered them to the wrong store. Ragan discussed the incident with Hawkins before warning Richardson and Hawkins told her to issue the discipline. Ragan testified that she also spoke to Richardson about the incident before writing him up. Richardson claims Ragan and other drivers left drugs at the wrong store and were not written up but could only identify two incidents one of which it is unclear whether Ragan left the drugs or another driver left the drugs.

Richardson received a warning on April 7, 2003 because he left his ice chest at the delivery warehouse and did not inform his supervisor of the mistake when it was discovered at his first stop. Richardson believes other drivers had forgotten their ice chests but did not receive warnings. Richardson admits he did not call and notify Ragan of the mistake even though he could have. Hawkins approved the discipline issued to Richardson for this incident and discussed it with Ragan before Richardson was notified. Richardson believes the discipline was discriminatory because Ragan disliked him and because he thinks Wesley Smith forgot his ice chest and did not get a write-up. In fact, Smith was also written up for forgetting his and for missing merchandise. Ragan and Hawkins do not recall any other driver ever forgetting their ice chests but stated that if any other driver had left one at the warehouse they would have been written up as well.

Richardson received a warning on April 11, 2003, for failing to report as scheduled and insubordination because he began coming in at 5:30 a.m. again instead of his scheduled time of 6:00 a.m.. Richardson's first customer opened at 8:15 a.m. He did not have to leave the facility until 6:15 a.m. or 6:30 a.m. because it took him about an hour and forty-five minutes to get to his first stop. Drivers were not supposed to sit outside a pharmacy in their vans waiting for it to open for security reasons. Further, drivers with the longest routes were not necessarily the ones who came to work the earliest because their start times depended on what time their first customer opened their store. Richardson claims the warning for the schedule issue was discriminatory because the company benefitted from him coming in early.

12

Richardson claims all of the other drivers came in early and did not get a warning. However, the record reflects that other employees have been warned for coming in early.

Richardson was given a warning for insubordination on June 18, 2003 for having the oil changed in his van without notifying Ragan. Richardson believes this warning was also discrimination against him based on his religion.

The last occurrence dealt with a delivery to Moon's Pharmacy when the narcotic tracking numbers were not on the form Richardson filled out for the pharmacy. Richardson contends this was because the drugs in question were on back order and he would not have known that until he arrived at the store that the drugs were missing because JMS did not note back orders on the packing slips. Shea Hall, an employee of Moon's Pharmacy, signed the delivery ticket anyway although there was no way for her to know what she received. If the narcotic numbers had been on the delivery sheet, JMS would have known which narcotics Hall received from the tracking numbers but Richardson failed to write them down.

Ragan recommended to Hawkins that Richardson should be terminated after the Moon Pharmacy incident and Hawkins agreed with the decision. Hawkins had the ultimate authority to determine whether Richardson would be terminated and could have decided to not follow Ragan's recommendation.[6] According to JMS, Richardson was repeatedly instructed on the procedure for writing up delivery tickets, ignored repeated warnings for his failure to do so and repeatedly failed to call and notify JMS about problems with his

_____

[6]Donna Ansley, who is apparently not a Jehovah's Witness, was also terminated for missing deliveries.

deliveries.  Richardson admits he failed to follow the procedures on writing up the forms even though he knew how to but claims other drivers also failed to properly fill out their reports.  Richardson admits he was told during his last written warning by Ragan that further write-ups would result in termination.  Pursuant to Defendant's policy, employees are supposed to be terminated after three write-ups and Hawkins made the decision to not terminate Richardson after the third write up.[7]

Richardson's route as well as the other routes were turned over to United Courier Service when JMS closed the Macon facility.  United Courier went bankrupt about a year later and the routes went to Stat Courier.  Ragan also lost her job when the Macon facility closed.

Richardson filed a charge of discrimination with the Equal Employment Opportunity Commission on April 12, 2004.  In the initial questionnaire, Richardson circled "race" (he is African-American) and "religion" as the types of discrimination alleged.  Richardson does not know if JMS received a copy of his Charge Questionnaire and JMS denies receiving a copy.  Richardson claims he told the EEOC counselor he felt he was discriminated against because of his religion based on a statement Judy Ragan allegedly made to him in 2001 that his "mind was on his religion and not his job"; that the counselor told him the facts that allegedly supported a religious discrimination claim were outside the 6-month limitations period and would be time barred; and, that the counselor advised him to base his charge on

---

[7]Rogers Dep. at 19.

race because Richardson is African-American and Ragan is Caucasian.[8]  Richardson signed

the charge alleging racial discrimination.  The Notice of Charge of Discrimination from the

EEOC dated May 18, 2004 indicates a charge based on race only and did not include religion.

Richardson never spoke to anyone at JMS after filing his charge with the EEOC.  The EEOC

closed its investigation and issued its final determination on January 6, 2005.   The

determination states, "Based on the evidence, it is more likely than not that Charging Party

has been subject to disparate terms and conditions of employment . . . because of his race,

Black, in violation of Title VII."  The EEOC mentioned religion for the first time in the

investigative process when it stated in the determination that, "Witness testimony further

supports that Charging Party was subjected to harassment because of his religion, Jehovah's

Witness, in violation of Title VII."   The EEOC did not provide any other information

regarding this new allegation.  It did not state who the witness was, what actions constituted

the alleged harassment, who allegedly harassed Richardson, when the alleged action(s) took

place or whether they occurred within 180 days of the charge.  All of JMS's communications

with the EEOC dealt exclusively with Richardson's claim that he was terminated because of

his race.

Ragan did not find out that Richardson was accusing her of religious discrimination

until after this lawsuit was filed.  Ragan was never contacted by the EEOC.  Ragan and

Richardson had one or two conversations about religion during his period of employment and

---

[8]Richardson Dep. at 55, 62-63.

those conversations were initiated by Richardson. The only person Richardson claims discriminated against him is Ragan. Ragan never told Richardson, and there is no evidence she ever told anyone else, she disliked Richardson because of his religion. Richardson never heard anyone at JMS say they disliked him because of his religion. Richardson admits that Ragan could have simply disliked him as a person. Hawkins never heard Ragan discuss Richardson's religion. Hawkins does not believe Richardson was treated differently by Ragan because of his religion. The other drivers testified that Ragan was always "nitpicking" and "riding" all of them, checking in on them, asking them why it took them so long to run their route and "regular supervisor stuff."

On September 26, 2005, Plaintiff Richardson filed the instant lawsuit alleging religious discrimination and harassment based on his religion pursuant to Title VII. Plaintiff did not allege racial discrimination in this case. Defendant JMS contends that Plaintiff's religious discrimination claims are barred for failure to exhaust those claims through the EEOC. Defendant further contends that even if the claims are not barred Plaintiff failed to establish a prima facie case of discrimination and that Defendant provided a legitimate, non-discriminatory reason for Plaintiff's termination - repeated violations of company policy.

### *Summary Judgment Standard*

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The Supreme Court has

explained that the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23. "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). "Summary judgment . . . is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citing Fed. R. Civ. P. 1; Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984)).

### *Exhaustion of Administrative Remedies*

Defendant JMS contends that Plaintiff Richardson failed to exhaust his administrative remedies for his religious discrimination claims because he failed to present those claims for

conciliation before the EEOC. Plaintiff contends he should not be prevented from bringing religious discrimination claims because he wanted to assert those claims in his EEOC charge but was told by someone at the EEOC he could not assert religious claims because they would be time barred.

In Green v. Elixir Industries, the Eleventh Circuit Court of Appeals recently reaffirmed the principle that "[b]efore filing a Title VII action, a plaintiff must exhaust his administrative remedies by filing a charge of discrimination with the EEOC." Green v. Elixir Industries, Inc., 152 Fed. Appx. 838, 840 (11th Cir. 2005), *cert. denied*, 126 S.Ct. 2024 (2006) (citing Sanchez v. Standard Brands, Inc., 431 F.2d 455, 460 (5th Cir.1970)). "Though we must liberally construe EEOC charges that are prepared without the assistance of counsel, a plaintiff's civil complaint remains 'limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" Id. (citing Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1280 (11th Cir.2004)).

Following his termination, Green filed a pro se charge of discrimination with the EEOC. Green checked the box stating that the discrimination alleged was racial. In the box where Green was required to state the dates of the discrimination, Green wrote "January 2, 2001" as the "earliest" and "latest" dates. In the factual particulars section, Green stated:

I. I was employed from March 7, 1995 until my discharge January 2, 2001. I was terminated for violation of the attendance policy, but I have no written warnings for attendance. White males that have written warnings and have committed further violations were not terminated.

II. Management stated I was discharged because of violation of the attendance policy.

III. I believe that I have been discriminated against because of my race (black) in violation of Title VII of the Civil Rights Act of 1964, as amended.

The EEOC investigated Green's charges and concluded that Green was not terminated because of his race. It issued Green a right to sue letter.

Id. at 839-840. Green claimed he told an EEOC investigator about the harassing conduct and provided paperwork to the EEOC substantiating the incidents concerning his hostile-environment claim. The EEOC in the interim destroyed Green's file. However, there was no dispute that Green's EEOC charge form did not include facts concerning his hostile-environment claim. Green subsequently filed a lawsuit in federal court alleging both racially-hostile environment discrimination and racially-motivated termination. Green's allegations included repeated and outrageous acts of racially motivated harassment. Id. at 840. The court of appeals held that all of the factual allegations contained in the plaintiff's EEOC charge related to his termination and none related to a retaliation claim. "Nothing in Green's EEOC charge related to incidents of harassment, nor did anything mention the dates on which they occurred. Because the facts alleged in Green's EEOC charge form [could not] be said to encompass a hostile work environment claim," the court affirmed the district court's finding that plaintiff's claim was procedurally barred. Id.

Similarly, in Jerome v. Marriott, when the plaintiff filed his EEOC charge he alleged only the denial of a promotion but when he filed suit in federal court he alleged race and gender discrimination in the form of pay practices, the denial of a promotion and racial harassment. Jerome v. Marriott Residence Inn Barcelo Crestline/AIG, 2006 WL 3487152

(11th Cir. Dec. 4, 2006). The plaintiff argued that because he circled "wages" on the EEOC

intake questionnaire and informed the EEOC about his disparate pay claim during the intake

process that the EEOC and defendants were on notice of his claim. Id. at *1. The court of

appeals noted, "EEOC regulations provide that charges should contain, among other things,

'a clear and concise statement of the facts, including pertinent dates, constituting the alleged

unlawful employment practices.'" Id. (quoting 29 C.F.R. § 1601.12 (a)(3)). "Although we

liberally construe EEOC charges that are prepared without the assistance of counsel, 'a

plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can

reasonably be expected to grow out of the charge of discrimination.'" Id. (citation omitted).

> When Jerome filed his EEOC charge, he alleged only the denial of a
> promotion. Nowhere [did] there appear on the charge a reference to his
> disparate pay claim. Jerome's only evidence for making the claim to the
> EEOC, other than his own unsworn statements, is an EEOC charge
> questionnaire on which he circled "wages" when prompted to identify the
> specific discriminatory actions he was complaining of. Immediately below this
> section, however, when asked to explain these discriminatory actions, Jerome
> complained only of being passed over for a promotion. Given his own
> explanation, merely circling "wages" on the questionnaire fell far short of
> putting the EEOC on notice that Jerome was also claiming that Crestline paid
> its white employees less than its black employees. And unlike the allegations
> in the Gregory case, the facts relating to Jerome's promotion claim (such as the
> comparative qualifications of Jerome and Schultz) do not encompass facts that
> would also support a disparate pay claim. Because Jerome failed to inform the
> EEOC of such a claim, the district court correctly granted the defendant's
> motion for judgment on the pleadings.

Id. at 2 (citing Gregory, *infra*).

In one of the most frequently cited cases in this area of the law, Gregory v. GA DHR,

the court of appeals held that an employee's claim was *not* administratively barred by her

failure to check the box on the EEOC charge because she alleged "facts in her EEOC charge that could have reasonably been extended to encompass a claim for retaliation because they were inextricably intertwined with her complaints of race and sex discrimination." <u>Gregory v. Georgia Dept. of Human Resources</u>, 355 F.3d 1277, 1280 (11th Cir. 2004). "That is, she stated facts from which a reasonable EEOC investigator could have concluded that what she had complained about is retaliation because of her complaints of . . . disparate treatment to the hospital's administration. Specifically, shortly after being subjected to certain allegedly discriminatory acts, she was terminated. An EEOC investigation of her race and sex discrimination complaints leading to her termination would have reasonably uncovered any evidence of retaliation." <u>Id.</u> (citation omitted).

> The purpose of this exhaustion requirement "is that the EEOC should have the first opportunity to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts. The purpose of the filing requirement is to insure that the settlement of grievances be first attempted through the office of the EEOC. This Court further has noted that judicial claims are allowed if they "amplify, clarify, or more clearly focus" the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate.
>
> In light of the purpose of the EEOC exhaustion requirement, we have held that a "plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." Courts are nonetheless "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII." As such, this Court has noted that "the scope of an EEOC complaint should not be strictly interpreted."

<u>Id.</u> at 1279-1280 (internal citations omitted). Therefore, an EEOC investigation can only be expected to grow out of, and a later determination based on, the facts presented by a

complainant in the intake questionnaire or charge form.

This was further explained in <u>Scott v. Kindred Hospitals</u> where the plaintiff asserted "she wanted to include a race discrimination claim in her EEOC charge but did not do so because the investigator told her that she could not claim race discrimination because over 75% of Defendant's workers were African-American." <u>Scott v. Kindred Hospitals Limited Partnership</u>, 2006 WL 2523093, *2 (N.D.Ga. Aug. 28, 2006). The plaintiff checked the boxes for "age" and "disability" discrimination but left "race" blank. The plaintiff also failed to mention race anywhere in her EEOC charge. <u>Id.</u> The court held the plaintiff's explanation did not "alter the requirement that she exhaust her remedies before filing a Title VII claim." <u>Id.</u> "An investigation into these new allegations in Plaintiff's Complaint could not reasonably be expected to grow out of Plaintiff's EEOC charge." <u>Id.</u> at 4.

Courts in this circuit have recognized an equitable tolling principle pertaining to the timely filing of an EEOC charge where, *inter alia*, the EEOC misleads a complainant about the nature of his rights under Title VII. <u>Chappell v. EMCO</u>, 601 F.2d 1295 (5th Cir. 1979). However, the courts have also noted that modifying the filing requirements because a complainant did not have knowledge of the time requirements "contravenes the normal rule that 'ignorance of legal rights or failure to seek legal advice, does not toll the statute.'" <u>Kazanzas v. Walt Disney World Co.</u>, 704 F.2d 1527, 1530 (11th Cir. 1983) (discussing tolling of the 180-day statute of limitations for filing) (citations omitted). The EEOC has also recognized that its counselors must adhere to the filing and investigative regulations. For

instance, in one case a complainant alleged he was discriminated against because of his age and presented that claim to the EEOC counselor.  Pettyjohn v. DOT, EEOC DOC 01861859, 1986 WL 634129 (Oct. 31, 1986).  The agency thereafter investigated the issue of age discrimination.  At the EEOC hearing, the complaints examiner announced that a new issue of discrimination on the basis of alcoholism was "raised by the evidence" and that he intended to include that basis among the matters to be considered even though the factual allegations in the EEOC charge related only to age discrimination.  "Thus, both the technical allegation and the underlying factual statement [dealt] solely with age discrimination."  Id. The EEOC panel determined it was error to include the basis of disability at the hearing and therefore error to find discrimination on that basis.  Id. at *2.[9]  The panel relied on another frequently cited case in this area, Sanchez, that set forth the principle that "the crucial element of a charge of discrimination is the factual statement contained therein."  Sanchez v. Standard Brands, Inc., 431 F.2d 455, 462 (5th Cir. 1970).

> A charge of discrimination is not filed as a preliminary to a lawsuit.  On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC.  Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law.  Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action.  Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation.  Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of

---

[9]The EEOC's interpretation of these statutes is entitled to great deference.  Oscar Mayer & Co. v. Evans, 441 U.S. 750, 761 (1979).

discrimination.

Id. at 466. "Title VII clearly contemplates that no issue will be the subject of a civil action until the EEOC has first had the opportunity to attempt to obtain voluntary compliance." Id. at 467. Sanchez also recognized that "once a timely complaint is filed with the EEOC it may later be amended to cure technical defects such as lack of verification or failure to attach a legal conclusion . . . to the factual occurrences complained of. Id. at 464 (citation omitted). See also 29 C.F.R. § 1601.12 (A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.). Thus, a complainant's failure to "check the box" with the applicable type of alleged discrimination when she executes her original EEOC charge is an amendable defect. Id.

Plaintiff Richarson relies on Wilkerson v. Grinnell for the argument that he "manifested his intent" to pursue a religious discrimination claim and that is sufficient to overcome the requirement to exhaust his claims through the EEOC conciliation process. Wilkerson v. Grinnell Corp., 270 F.3d 1314 (11th Cir. 2001). In Wilkerson, no charge form was ever completed although the EEOC eventually issued a Notice of Right to Sue. The plaintiff thereafter used the intake questionnaire for purposes of filing suit in federal court.

The district court dismissed the case holding that the plaintiff failed to timely file a *charge* of discrimination. The court of appeals reversed the summary judgment granted in favor of the employer on the timeliness ground finding that the intake form could function as a charge based on the particular facts of that case but did not address the scope of the complaint that would be permitted in the district court.

Plaintiff Richardson's claims in this case must be limited by the scope of the EEOC investigation which could reasonably have been expected to grow out of the charge of racial discrimination. The EEOC charge made no reference whatsoever to a "religion" claim. Rather, the only box that was checked was "race" and the factual statements given therein all pertained to a racial discrimination claim: a "white" female was his supervisor and Plaintiff felt he was discriminated against "because of his race (Black)." Further, the intake questionnaire was never sent to JMS and the Human Resources manager who was deposed on the issue, Isaac Rogers, testified that the company understood the EEOC charge and investigation involved only allegations of racial discrimination.[10] Based on the facts of this case, Plaintiff cannot be relieved of the requirement to have exhausted his claims through the EEOC. Plaintiff could have amended his charge to add more claims or could have included facts in his charge that would have put the EEOC on notice to investigate a religion claim and the defendant on notice to respond to such a claim. However, Plaintiff did not avail himself of the opportunities that existed. A plaintiff cannot reserve claims for a later lawsuit

---

[10]Rogers Dep. at 58.

that could have been addressed in the EEOC investigative and conciliative process. To allow a religious discrimination claim in this case would completely circumvent the mechanisms in place for the EEOC to conciliate all potential claims between an employee and an employer. Because Plaintiff failed to exhaust his religious discrimination and harassment claims through the EEOC, all religious discrimination claims are procedurally barred.

### Substantive Merits of Claims

Even though the Court has determined that all of Plaintiff's religious discrimination claims are procedurally barred, the Court will also briefly address why the claims would not otherwise have merit. Plaintiff's employment discrimination claims, based solely on circumstantial evidence, are subject to the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Koch v. Rugg, 221 F.3d 1283, 1291 n.31 (11th Cir. 2000). To prevail on these claims, Plaintiff Richardson had to show: (1) that he is a member of a protected class (i.e., particular or different religion in this case); (2) that he was qualified for the job in question; (3) that he was terminated; and (4) that other equally or less qualified employees who were not members of the protected class replaced him or that he was treated *less* favorably than employees of different religions *because of* his religion. Denney v. City of Albany, 247 F.3d 1172, 1183 (11th Cir. 2001). If he made those showing, Defendants would be required to articulate some legitimate, non-discriminatory reason for Plaintiff's termination. Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1184 (11th Cir. 1984). "In order to establish a hostile work environment claim, the plaintiff must show that

'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ramon v. AT & T Broadband, 195 Fed. Appx. 860, 865 (11th Cir. 2006) (citation omitted). "Discrete acts that fall within the [180-day] statutory period do not make related acts that fall outside the period timely. On the other hand, hostile environment claims, which are based on the cumulative effects of individual acts, collectively may constitute 'one unlawful employment practice.'" Id. at 866. "Harassment is subjectively severe and pervasive if the complaining employee perceives the harassment as severe and pervasive, and harassment is objectively severe and pervasive if a reasonable person in the plaintiff's position would adjudge the harassment severe and pervasive." Id. "To determine the objective severity of harassment, 'courts consider the frequency of the conduct, the severity of the conduct, whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and whether the conduct unreasonably interferes with the employee's job performance.'" Id. To establish a prima facie case of retaliation under Title VII, a plaintiff must present evidence that he engaged in statutorily protected expression, was subject to an adverse employment action and that there is a causal link between the protected expression and the adverse action. Richardson v. Dougherty County, Ga, 185 Fed. Appx. 785, 790 (11th Cir. 2006) (citing Taylor v. Runyon, 175 F.3d 861, 868 (11th Cir.1999) (because a year passed between the time plaintiff requested an accommodation and his termination plaintiff could not establish a causal link between the

protected expression and his termination).  Federal courts do not "sit as a super-personnel department that reexamines an entity's business decisions," nor do they "sit to second-guess the business judgment of employers."  Davis v. Town of Lake Park, 245 F.3d 1232, 1244 (11th Cir. 2001) (citations omitted).  Courts "are not in the business of adjudging whether employment decisions are prudent or fair.  Instead, [their] sole concern is whether unlawful discriminatory animus motivates a challenged employment decision."  Damon v. Fleming Supermarkets of Florida, Inc., 196 F.3d 1354, 1361 (11th Cir.1999).

Plaintiff Richardson was terminated on January 20, 2004 for failing to properly account for narcotics and for repeatedly failing to follow the proper procedures for carrying out his various responsibilities.[11]  For one of the occurrences of missing narcotics, Ragan testified that to her knowledge the drugs were never found.  The record reflects that Plaintiff Richardson had a history of verbal and written warnings for performance issues leading up to his termination:  not following directions for writing up orders on the delivery receipts, not locking the narcotics cage,[12] leaving drugs at the wrong store, forgetting his ice chest, not adhering to the schedule set by his managers, not personally calling JMS to report missing drugs, not reporting to his managers when he was taking his van in for servicing and not

---

[11] Id. at 47, 109, 124-125.  See also disciplinary reports from 10/9/01, 10/11/01, 2/18/03, 4/7/03, 4/11/03 and 6/18/03 and Termination Report from 1/20/04.

[12]Plaintiff Richardson admitted that he "could not answer" whether the warning about the cage was because of his religion.  Richardson Dep. at 156.

pulling labels off the boxes.[13]  Richardson admits he did not report the missing narcotics to Ragan and that he failed to follow JMS procedures on writing up the substances.  Richardson also admits he was informed in his last written warning that another write-up would result in termination.

Plaintiff provided a great deal of speculation, assumptions and hypotheticals as to why he was allegedly treated differently from his colleagues.  However, a plaintiff's belief that some action by an employer was discriminatory does not show that discrimination occurred or that Plaintiff was treated in a way that violated his right to be free from discrimination in the workplace.  Plaintiff claims that the following are incidents of religious "discrimination" or "harassment" that he experienced:

- Ragan treating Richardson differently than she treated the other drivers by "blowing things out of proportion" with him, talking "down" to him, "picking on" him, keeping a "close eye" on him, "nitpicking" him, purposefully causing him aggravation and criticizing him "more harshly" than anyone else;

- Ragan writing Richardson up for leaving his ice chest at the warehouse while not writing up others for the same problem;[14]

---

[13]Ragan Dep. at 116.  In fact, pursuant to JMS policy, Plaintiff should have been terminated after 3 written warnings.  Rogers Dep. at 19.

[14]One of the other drivers, Wilson Smith, testified that he was in fact written up for forgetting his ice chest.  Smith Dep. at 47.

- Ragan reprimanding Richardson for taking his van to be serviced;[15]

- Ragan reprimanding Richardson for arriving at the warehouse early;[16]

- Ragan reprimanding Richardson for not pulling labels off boxes;

- Ragan reprimanding Richardson for the way in which he checked and wrote-up his merchandise when Ragan received several customer calls per week stating that other drivers had arrived without a full shipment;[17]

- Regan allegedly searching Richardson's van on a regular basis and on one occasion allegedly removing his religious tapes from the van;[18]

- Ragan not allowing Richardson to take a Friday off to attend a religious convention; and

- Ragan allegedly stating to Richardson that he did not receive a promotion because his mind was "on his religion instead of on his job."

The evidence shows that Plaintiff clearly violated the policies as alleged by Defendant

---

[15]Smith testified that he would always let Ragan know when he was having his van serviced so that Ragan would not worry about where he was going or when he was coming because "she pretty much had you on a schedule what time you come through that back door." Smith Dep. at 67. Chad Weldon, another driver, also testified along the same lines. Weldon Dep. at 38.

[16]Smith testified that Ragan did not want any of the drivers coming in early and wanted them all to follow a strict schedule. Smith Dep. at 68, 86.

[17]Smith testified that when he forgot drugs he was also reprimanded. Smith Dep. at 83. Smith received two written warnings, one for delivering drugs without waiting for them to be checked in and one for lack of "customer service." See Plf.'s Ex. to Summ. J. Resp. at P26 (Corrective Action forms for Smith).

[18]Smith also testified that Ragan regularly "ransacked" everybody's van looking for gas receipts. Smith Dep. at 63.

JMS.  Further, Ragan's alleged statement about Plaintiff's mind being on his religion and not on his job does not constitute evidence of discrimination.  Regardless of what Plaintiff was reprimanded for having his mind on - his religion, his race, his marital status or the color of the sky - if he had his mind on something other than his work and that distracted him from his work, Ragan would have a legitimate reason for disciplining him.  Moreover, this remark is not the kind of "severe" or "pervasive" conduct that courts have recognized as discriminatory harassment.  See Richardson v. Dougherty County, Ga, 185 Fed. Appx. 785 (11th Cir. 2006) (no "direct evidence" of discrimination where plaintiff who was a Seventh Day Adventist (1) was told defendants would not accommodate him and that he "needed to find another religion or another job," (2) where the defendants said they were "sick of" plaintiff asking for every Saturday off and thus he needed to find another job and (3) where plaintiff was referred to as "preacher man," a "minister" and was told he was "too preachy").  Plaintiff acknowledged in his deposition that he did not receive a raise because Ragan was displeased with his performance.  He just assumed it was because of his religion but admitted he did not know why she was displeased with his performance.[19]

Plaintiff Richardson failed to present evidence that individuals of other religions were treated more favorably in the terms or conditions of their employment or that Plaintiff was treated less favorably than other employees *because of* his religion.  To the contrary, Defendant JMS had previously terminated another driver who was not a Jehovah's Witness,

---

[19]Richardson Dep. at 109.

Donna Ansley, for failure to follow the proper delivery procedures.[20] Further, there is no evidence that any other similarly situated employee had as many or the same type of performance issues yet were not reprimanded and eventually terminated. Ragan's alleged refusal to allow Plaintiff to attend a religious convention cannot be used to establish discrimination because there is no evidence any other similarly situated employee was permitted to take a day off work to attend another denomination's religious convention. Richardson was not replaced by anyone of a different religion because he was not replaced. Shortly after he was terminated, JMS closed the Macon location and turned the routes over to another company.[21] Plaintiff failed to establish he was retaliated against for the letter he wrote to JMS in 2001 in which Plaintiff complained about Ragan because he failed to present evidence of a substantively or temporally causal link between his letter and the termination in 2004, or any of the reprimands. Finally, Plaintiff failed to present evidence of a hostile work environment because he failed to present evidence that his former workplace was "permeated" with discriminatory intimidation, ridicule or insults that were sufficiently severe or pervasive to alter the conditions of his employment or that created an abusive working environment nor was there evidence of physically threatening or humiliating conduct. This

---

[20]Plaintiff argued that Ragan was not clocking in properly at one point and caused a fire in the warehouse but was not reprimanded for these issues. First, Ragan is not a valid comparator to Plaintiff because Ragan was not "similarly situated" to Plaintiff. She was Plaintiff's supervisor. However, she did receive a written warning for the incident. See Plf.'s Ex. to Summ. J. Resp. at P9 (Aug. 18, 2003 Corrective Action form for Ragan); Hawkins Dep. at 87, 144. Second, Hawkins testified that he was not aware of the improper clocking-in issue and if he had been he would have terminated her.

[21]Ragan Dep. at 27.

is a classic case of mere "offensive utterances" that cannot and do not constitute discrimination. This Court is not in the business of adjudging whether Ragan's and/or Hawkins' employment decisions were prudent or fair. Instead, this Court's sole concern is whether unlawful discriminatory animus motivated Plaintiff's termination or the reprimands he received, and this Plaintiff did not show.

Importantly, most of Plaintiff's claims are in fact time barred because most of the matters about which Plaintiff complains occurred more than 180 days before the filing of his EEOC charge and were spread across a three-year span with the last occurrence 216 days before his termination.[22] Plaintiff therefore cannot claim that he was "misled" by the EEOC when the EEOC counselor was in fact correct about the incidents being time barred.[23] Further, all of the acts about which Plaintiff complains were isolated acts having no relationship to any previous or future occurrence so he cannot claim a "continuing violation" type of discrimination.

Plaintiff presented no evidence of anything more than a personality conflict between himself and Ragan. Plaintiff's interpretation of Ragan's feelings toward him was that she

---

[22]2/7/99 - Date of Hire; 8/9/01 - Richardson Sends Letter to Issac Rogers and Rick Simarly; 10/9/01 - corrective action for writing delivery receipts; 10/11/01 - corrective action for not locking the narcotics cage; 5/28/02 - Video taping of Richardson's Route; 2/18/03 - corrective action for failure to check off drugs on delivery sheet and leaving drugs at wrong store; 4/7/03 - corrective action for forgetting ice chest; 4/11/03 - corrective action for not adhering to schedule; 6/18/03 - corrective action for failure to notify supervisor van needed servicing; 10/15/03 - Time Bar date; 1/20/04 - termination; 4/12/04 - EEOC Charge filed.

[23]Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001) ("For a charge to be timely in a non-deferral state such as Georgia, it must be filed within 180 days of the last discriminatory act.") (citing 42 U.S.C. § 2000e-5(e)(1) (1994)) (other citation omitted).

disliked him and that although she had never said anything specific she "showed her dislike" to him.[24]  Several individuals testified that Ragan and Plaintiff Richardson disliked each other, that Plaintiff resented being managed by a woman and that Ragan was tough on all the employees when they violated company policy.[25]  There is no support in the evidence for Plaintiff's claims that he was reprimanded and terminated *because of* his religion.  Even if Plaintiff had made out a prima facie case that he was reprimanded or terminated based on his religion, Defendant JMS articulated legitimate, non-discriminatory reasons for Richardson's warnings and eventual termination - his continual violation of company policy over a period of several years, and in particular those regarding the proper handling of dangerous, government-regulated narcotics and controlled substances.

### *Conclusion*

Because Plaintiff failed to exhaust his religious discrimination and harassment claims through the EEOC process, all religious discrimination claims are procedurally barred. Further, Plaintiff failed to establish a prima facie case of religious discrimination or harassment and, even if he had, Defendant provided a legitimate, non-discriminatory reason for Richardson's reprimands and eventual termination - his numerous violations of company policy.  Defendant's motion for summary judgment is GRANTED and judgment shall be entered in Defendant's favor.

---

[24]Richardson Dep. at 143, 185.

[25]Hawkins Dep. at 21; Rogers Dep. at 29; Rhodes Dep. at 25, 40; Butler Dep. at 50, 55-57; Smith Dep. at 37.

**SO ORDERED this 6th day of February, 2007.**

**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**